## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 7462 | **DATE** | 11/19/2004 |
| **CASE TITLE** | United States Fire Protection Illinois, Inc. vs. St. Paul Fire And Marine Insurance Company | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 12/3/2004 at 9:00 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. St. Paul's motion for summary judgment (Doc. No. 44-1) is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | 11-22-04 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | 62 |
| | Copy to judge/magistrate judge. | | 11/19/2004 | |
| ETV | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | ETV mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES FIRE PROTECTION )
ILLINOIS, INC., )
)
Plaintiff, )
)
v. ) No. 02 C 7462
)
ST. PAUL FIRE AND MARINE ) Judge Rebecca R. Pallmeyer
INSURANCE COMPANY, )
)
Defendant. )

## MEMORANDUM OPINION AND ORDER

Plaintiff United States Fire Protection Illinois, Inc. ("USFP") purchased a variety of comprehensive business insurance policies from Defendant St. Paul Fire and Marine Insurance Company ("St. Paul"). USFP alleges that St. Paul breached its contractual obligations under certain workers' compensation and general liability policies, as well as the implied duties of good faith and reasonable care, by mishandling 16 workers' compensation claims filed by USFP employees in policy years October 27, 1990 through October 27, 1994. USFP claims that as a result of these breaches, St. Paul overstated USFP's premiums by more than $800,000. St. Paul denies any wrongdoing and alleges in a counterclaim that USFP still owes $117,153 in unpaid premiums. St. Paul now seeks summary judgment on both the complaint and the counterclaim. For the reasons set forth here, the motion is denied.

## BACKGROUND

USFP is an Illinois corporation with its principal place of business in Lake Forest, Illinois. USFP provides full service industrial, commercial, and residential fire sprinkler systems. (St. Paul 56.1 ¶ 1; Cmplt. ¶ 1; http://www.unitedstatesfireprotection.com.)[1] St. Paul is a Minnesota

---

[1] St. Paul's Rule 56.1(a)(3) Statement of Undisputed Material Facts is cited as "St. Paul 56.1 ¶ __."

corporation with its principal place of business in St. Paul, Minnesota. It is licensed and authorized to sell insurance in Illinois and other states. (St. Paul 56.1 ¶ 2; Cmplt. ¶ 2.)

## A. The Loss Sensitive Policies

Beginning in 1990, USFP purchased certain comprehensive business insurance policies from St. Paul, including "Workers Compensation and Employers Liability Insurance" and "Commercial General Liability" covering the years October 27, 1990 through October 27, 1994 (collectively, the "Loss Sensitive Policies").[2] (USFP 56.1 ¶ 1; Cmplt. ¶ 4.) All of the Loss Sensitive Policies were subject to St. Paul's Retrospective Rating and/or Deductible Endorsement, which St. Paul used to determine the amount of premium USFP owed each year. That Endorsement gave St. Paul the right to recalculate and collect premiums for each one-year policy after it had expired, based on losses incurred in that year. St. Paul calculated premiums using retrospective and deductible formulas that were based on USFP's Standard Premium rate. One of the elements used to develop the Standard Premium was "Ratable Incurred Loss" or "Incurred Losses." Ratable Incurred Loss "can equal amounts that have been paid [out on claims] plus reserves set aside for

---

[2]     When an insurance policy is "loss sensitive," the insured's final premium is based on the insured's losses. *See* http://insource.nils.com/gloss/GlossaryTerm.asp?tid=3611. The specific Loss Sensitive Policies at issue here were in effect as follows:

1.     WVO1204286, effective 10/27/90 to 10/27/91
2.     KKO1200048, effective 10/27/90 to 10/27/91
3.     WVO1204484, effective 10/27/91 to 10/27/92
4.     KKO1200083, effective 10/27/91 to 10/27/92
5.     WVA1200548, effective 10/27/92 to 10/27/93
6.     KKO1200113, effective 10/27/92 to 10/27/93
7.     WVA1200907, effective 10/27/93 to 10/27/94
8.     KKO1200147, effective 10/27/93 to 10/27/94
9.     KKO1200170, effective 10/27/93 to 10/27/94
10.    WVA1201121, effective 10/27/93 to 10/27/94

(Cmplt. ¶ 4.) The disputed claims involve only the first, third, fifth, sixth, and seventh policies, though USFP claims that St. Paul's unreasonable claim handling affected premiums in the other policy years as well. (St. Paul 56.1 ¶ 43; USFP's Local Rule 56.1(b)(3)B) Statement of Additional Facts in Opposition to St. Paul's Motion for Summary Judgment and Local Rule 56.1(a)(3) Statement of Facts (hereinafter "USFP 56.1") ¶ 82.)

possible future payments." It may also include "allocated loss adjustment expenses"[3] and expenses incurred by St. Paul in seeking recovery of paid losses from third parties. (Cmplt. ¶¶ 5-7; St. Paul 56.1 ¶ 16; USFP 56.1 ¶ 4.)

In calculating the annual premiums charged on the Loss Sensitive Policies, St. Paul included certain percentages or factors that it used as multipliers against the Standard Premium. Depending on the type of policy, St. Paul used such multipliers as a "Basic Premium Factor," a "Loss Conversion Factor," a "Tax Multiplier," and a "Deductible Factor."[4] (Cmplt. ¶ 9.) St. Paul determined its claim handling fee by applying a Loss Conversion Factor to the Ratable Incurred Loss. As the Ratable Incurred Loss increased, St. Paul's fee for handling claims also increased. (Id. ¶ 10.)

St. Paul developed the Standard Premium for the Loss Sensitive Policies based on every hundred dollars of payroll multiplied by the "employee classification rate,"[5] multiplied by the "experience modification factor" for USFP. (Cmplt. ¶ 12.) USFP's experience modification factor, which compares actual and expected losses, is developed by the National Council of Compensation Insurance based on USFP's loss history. When actual losses exceed expected losses, the experience modification factor increases and causes the Standard Premium to increase as well. (Id. ¶ 13.) USFP's Ratable Incurred Loss in a given policy year is reflected in the experience modification factor applied in the next three years. In other words, "the experience modification factor impacted the development of the Standard Premium of USFP in the second,

---

[3]     The parties do not define this term, nor do they explain whether any amounts other than paid claims, reserves, and allocated loss adjustment expenses may be part of the Ratable Incurred Loss.

[4]     The parties do not define the terms "Basic Premium Factor," "Loss Conversion Factors," "Tax Multiplier," or "Deductible Factor," nor explain how those multipliers affected the Standard Premium.

[5]     The parties do not define the term "employee classification rate" or explain how it is calculated.

3

third and fourth years subsequent to the policy-year the losses occurred." (*Id.* ¶ 14.) The greater the amount of money St. Paul paid, or estimated that it paid for losses and expenses associated with claims under the Loss Sensitive Policies, the higher the "Experience Modifiers" became, and the more St. Paul could charge USFP in annual premiums. (*Id.* ¶¶ 16, 17; St. Paul 56.1 ¶ 7; USFP 56.1 Resp. ¶ 7.)[6]

## B.    Procedures for Handling Claims

St. Paul's Claim Division Procedure Manual "details the procedures by which claims are to be handled by various Company claim offices." (Claim Division Procedure Manual, Ex. 17 to USFP 56.1, at 25.) For "lost time" claims resulting from employees missing work due to injury, St. Paul claims adjusters are expected to obtain a variety of medical reports, including (1) the initial medical report; (2) a medical report summarizing each office visit; (3) change of condition medical reports; (4) admitting and discharge hospital reports; (5) operative reports; (6) emergency room reports; (7) PPD (permanent partial disability) rating reports; and (8) final medical reports. (*Id.* at 376.) The Manual's "guidelines for thorough investigatory procedures" state that claims adjusters should obtain statements from the insured, the claimant, and appropriate witnesses "wherever good judgment indicates the need to secure and preserve facts." (*Id.* at 440.) The types of injuries requiring the adjuster to engage in "statement activity" include:  (1) occupational disease; (2) cumulative trauma; (3) heart attack or stroke; (4) emotional distress; (5) back injuries where the claimant is off work two weeks or longer, or has a previous history of back injury; (6) questions of compensability, including those claims occurring away from premises controlled by the insured or late reporting by claimant to insured; (7) subrogation; and (8) possible involvement of the "Second Injury Fund."[7] (*Id.* at 441.)

---

[6]     USFP's Response to St. Paul's Rule 56.1(a)(3) Statement of Undisputed Material Facts is cited as "USFP 56.1 Resp. ¶ __."

[7]     Neither party has provided a definition of "Second Injury Fund."

The Manual provides that claims adjusters should obtain independent medical examinations if: (1) consultation is required; (2) the treating physician is not furnishing substantive reports; or (3) final disability rating by a specialist is desired. (*Id.* at 447.) In addition, claims adjusters "usually . . . might want to visit the loss site if there is some type of possible subrogation involved in the claim." (Keil Dep., Ex. 18 to USFP 56.1, at 61-62.) As St. Paul characterizes it, the Manual merely sets forth "guidelines" for handling claims and requires a "reasonable, common sense approach to the problems faced by [St. Paul's] insureds." (St. Paul 56.1 Resp. ¶¶ 30-35.)

## C.    The Dispute Over Premiums

USFP contends that St. Paul claims adjusters failed to follow proper procedures for handling 16 workers' compensation claims. Before discussing USFP's challenges to each specific claim file, the court will review the procedural history of the parties' dispute. USFP first began questioning St. Paul's handling of certain workers' compensation claims in 1997. On July 8, 1997, David L. Jennings of The Rockwood Company[8] sent a letter to USFP President Gregg Huennekens enclosing a "tentative retrospective adjustment" from St. Paul seeking payment by USFP of an additional $59,132 in retrospective premiums for the 1992-93 and 1993-94 policy years. (Letter from D. Jennings to G. Huennekens of 7/8/97, Ex. 11 to WRAMSCO Audit Report, Ex. F to St. Paul 56.1.) On August 25, 1997, Jennings sent a letter to Joe Zydlo, a Chartered Property Casualty Underwriter for St. Paul, requesting a meeting between Huennekens and "a St. Paul representative" to discuss the workers' compensation claims that had generated the additional

---

[8]    The Rockwood Company is "one of the Chicago area['s] largest and oldest independent insurance agencies." (*See* http://www.rockwoodco.com.) The parties do not explain the relationship between The Rockwood Company and USFP, though St. Paul states elsewhere in its response to USFP's Local Rule 56.1 statement that USFP "made some inquiries through its broker." (St. Paul's Response to U.S. Fire's 56.1(b)(3)(B) Statement (hereinafter "St. Paul 56.1 Resp.") ¶ 16.)

$59,132 premium obligation.[9]  (Letter from D. Jennings to J. Zydlo of 8/2/97, Ex. 5 to USFP 56.1; St. Paul 56.1 ¶ 9.)  There is no indication in the record that anyone responded to Jennings's letter.

On December 19, 1997, St. Paul issued a final invoice to USFP for the $59,132.  (USFP 56.1 ¶ 6.)  USFP refused to pay the invoice.  Instead, early in January 1998, Huennekens called Zydlo directly to request additional information regarding the underlying workers' compensation claims.  Zydlo did not respond immediately and on January 13, 1998, Huennekens hired WRAMSCO[10] to conduct an audit of the St. Paul claim files.  (Id. ¶¶ 12-14; Audit Contract, Ex. 7 to USFP 56.1; Amended Counterclaim ¶ 15.)  Huennekens called Zydlo to notify him of that decision.  This time, Zydlo responded by letter dated January 26, 1998, stating that he had advised Jennings "a few months ago" to contact St. Paul's Claim Service Coordinator, Song Kim, to discuss the claims but that no one from The Rockwood Company or USFP had done so.[11]  Zydlo reiterated that Huennekens could contact Mr. Kim to discuss the claims or to schedule a claim audit.  (Letter from J. Zydlo to G. Huennekens of 1/26/98, Ex. 6 to USFP 56.1.)

WRAMSCO did conduct an initial audit of nine of the claim files at issue in this case in early 1998 and reported its findings to Huennekens on July 24, 1998.[12]  (USFP 56.1 ¶¶ 15, 17; Letter from R. Wills to G. Huennekens of 8/7/98, Ex. 10 to USFP 56.1.)  There does not appear to be any written summary of those initial findings, but in an August 7, 1998 letter to Huennekens, Raymond

---

[9]     According to Jennings, "the major dollar amount was generated by Walter Harvey and the 2 (two) claims generated in the Arizona office."  (Ex. 5 to USFP 56.1.)  The parties have not otherwise identified Mr. Harvey or explained which two claims were "generated" in Arizona.

[10]    WRAMSCO describes itself as a "resource reduction exposure company" that, among other things, conducts claim audits to identify fraudulent and exaggerated injury claims. (See http://www.wramsco.com.)

[11]    Zydlo's letter indicates that he left a voice mail message for Huennekens on or about January 22, 1998.  (Ex. 6 to USFP 56.1) ("Per my phone message reply to you last Thursday . . .)

[12]    Of the 16 workers' compensation claims now in dispute, it is not clear which nine were included in WRAMSCO's July 1998 audit.

W. Wills, Assistant Vice President of WRAMSCO, stated that in WRAMSCO's opinion, USFP did not owe any further premium to St. Paul on the nine claim files and was, in fact, entitled to a refund. (Letter from R. Wills to G. Huennekens of 8/7/98, Ex. 10 to USFP 56.1.)

On November 12, 1998, Zydlo and Kim met with a representative from WRAMSCO (presumably Wills) to discuss the results of WRAMSCO's audit. (USFP 56.1 ¶ 18; Letter from R. Wills to S. Kim of 6/17/99, Ex. 8 to USFP 56.1.) Kim apparently advised that St. Paul would review the issues and concerns raised by USFP and get back to WRAMSCO with a response. (Ex. 8 to USFP 56.1.) A few days later on November 17, 1998, St. Paul issued an invoice to USFP for $81,915 in additional premiums owed under the 1992-93 and 1993-94 Loss Sensitive Policies ($59,132 for the 1997 retrospective adjustment plus $22,783 for the 1998 retrospective adjustment); USFP again refused to pay the bill. (USFP 56.1 ¶ 7; Amended Counterclaim ¶¶ 16, 17; Answer to Amended Counterclaim ¶ 16.) Several months passed without any apparent contact from Kim regarding the concerns raised at the November 12, 1998 meeting. Wills sent Kim a letter on June 17, 1999 and again on July 12, 1999 seeking St. Paul's position, but it does not appear that Kim or anyone else at St. Paul responded to that correspondence. (Exs. 8 and 12 to USFP 56.1.)

Almost one year later, on July 20, 2000, Wills met with certain unspecified representatives of St. Paul to again discuss the initial audit findings. (Letter from R. Wills to G. Huennekens of 7/20/00, Ex. 13 to USFP 56.1.) Neither party has provided details regarding that meeting, but the participants apparently discussed settlement and possible arbitration. (*Id.*) Also in 2000, St. Paul charged USFP an additional $6,722 in retrospective premiums for that year.[13] (USFP 56.1 ¶ 8.)

The record does not describe the parties' interactions between July 20, 2000 and May 2001. On May 13, 2001, St. Paul issued USFP an invoice for $28,516 in additional premiums under the

---

[13] The annual adjustment for 1999 was $0. (Amended Counterclaim ¶ 18.)

"10/27/90 to 10/27/94" policy years. (USFP 56.1 ¶ 9; Letter from D. Page to G. Huennekens of 5/13/01, Ex. 3 to USFP 56.1.) On August 16, 2001, WRAMSCO audited six additional claim files at issue in this case.[14] (USFP 56.1 ¶ 21; Email from R. Wills to D. Finney of 8/9/01, Ex. 14 to USFP 56.1.)

## D. The Disputed Claim Files

With this background in mind, the court turns to USFP's specific objections to St. Paul's handling of the 16 disputed workers' compensation files. In each case, USFP argues, St. Paul valued the claim at more than it was actually worth. In making its objections, USFP relies primarily on the Audit Report and Audit Notes of Raymond Wills. Wills has worked in the insurance industry for more than 25 years and, as Vice President of WRAMSCO, is involved in risk management, risk retention, risk transfer, and risk finance programs, including claim investigation and management, insurance program and claim audits, underwriting and premium development, and experience modification factor investigation and development. (USFP 56.1 ¶¶ 95, 96.)

St. Paul generally denies that its adjusters mishandled claims and objects to USFP's exclusive reliance on the opinions of Wills. St. Paul, not USFP, has moved for summary judgment; St. Paul nevertheless charges USFP with "attempting to use the Local Rules to require St. Paul to defeat a motion for summary judgment by dumping their expert's opinions into a Rule 56.1(b)(3)(B) Statement of Undisputed Facts." (St. Paul 56.1 Resp. ¶ 48.) St. Paul notes that USFP's President Huennekens testified that he "almost always" attended claims meetings, asked questions at those meetings, and does not recall being dissatisfied with St. Paul during those meetings. (St. Paul 56.1 ¶¶ 9, 11.)

The parties' positions regarding the disputed claim files are set forth below.

---

[14]     Of the 16 workers' compensation claims now in dispute, it is not clear which six were included in WRAMSCO's August 2001 audit.

## 1. Claimant No. 1

Claimant No. 1 injured his shoulder on December 5, 1990 and ultimately underwent surgery. (St. Paul 56.1 ¶ 37; Ex. 12 to WRAMSCO Audit Notes, Ex. H to St. Paul 56.1, at 2.) St. Paul calculated his average weekly wage for purposes of computing workers' compensation as $880, but Wills says the average weekly wage should have been $842.35.[15] (USFP 56.1 ¶ 48; Ex. 12 to WRAMSCO Audit Notes, at 4.) Wills notes that Claimant No. 1 had a lawsuit pending in Indiana but that St. Paul did not investigate it. Wills does not know the basis for the lawsuit but questions whether it may have involved the same injuries at issue in the workers' compensation claim. (Ex. 12 to WRAMSCO Audit Notes, at 4.) Wills also points out that, as reflected in a handwritten note from USFP Superintendent Robert Martens dated December 6, 1990, the day after Claimant No. 1's injury, Martens called Claimant No. 1 at home to tell him where to report for work the next day and Claimant No. 1 did not mention any problems with his arm at that time. (USFP 56.1 ¶ 51; Ex. 12 to WRAMSCO Audit Notes, at 1-2.)

St. Paul settled the claim on or about August 5, 1992.[16] (St. Paul 56.1 ¶ 37.) By Wills's calculations, Claimant No. 1 received approximately 96% of the value of his arm even though the highest total percentage listed for arm injuries on St. Paul's 1997 Workers' Compensation Reserve Guide for Workers' Compensation Claims is 25% permanent partial disability of the arm. (USFP 56.1 ¶ 50; Workers' Compensation Reserve Guide, Ex. 28 to USFP 56.1, at SPC011089.) St. Paul claims that Wills did not take into consideration the "claim as a whole" or "the view of the claim in terms of a percentage of the 'man as a whole.'" (St. Paul 56.1 Resp. ¶ 50.) According to St. Paul,

---

[15] As described *infra*, in several instances the parties differ as to the appropriate wage for the employee claimants. The court is uncertain of the significance of these differences, as the parties agree that there are multiple, reasonable approaches to calculating average weekly wage, including four approaches set forth in the Illinois Workers' Compensation Act. (St. Paul 56.1 ¶¶ 60, 61.) *See also* 820 ILCS 305/10.

[16] It is undisputed that St. Paul had the right to settle claims. (St. Paul 56.1 ¶ 8.)

"[t]he Guidelines attached as Exhibit 28 to U.S. Fire's Motion themselves recognize factors of increased exposure." (*Id.*)

   **2.   Claimant No. 2**

   Claimant No. 2 injured his left buttock and back when he fell off a ladder on December 5, 1990 while working at a job site in Elgin, Illinois. (St. Paul 56.1 ¶ 32; Ex. 7 to WRAMSCO Audit Notes, at 1, Workers Compensation & Structural Work Act Investigations dated 12/29/90, at 3 (SPC008347).) St. Paul's claims adjuster did not believe USFP had a subrogation claim against the ladder manufacturer and stated that a subrogation claim against the general contractor, W.E. O'Neil Construction Company, "might be very difficult because according to the contract we have obtained, the general contractor has been made an additional insured under your [USFP's] policy." (Ex. 7 to WRAMSCO Audit Notes, at 4, quoting Workers Compensation & Structural Work Act Investigations dated 12/29/90, at 8 (SPC008342).) St. Paul did not pursue any third-party recovery and settled the claim on August 26, 1991. (USFP 56.1 ¶ 52; St. Paul 56.1 ¶ 32.) USFP suggests that this was improper but does not explain why. Wills acknowledges that the contract with the general contractor "reflect[ed] that it did require a waiver of subrogation to the benefit of" the general contractor. He notes, however, that the file "did not contain a copy of the general liability policy in the event a common law action was filed by the claimant against the general contractor and the general contractor in turn filed a third party complaint seeking contribution from the employer." (Ex. 7 to WRAMSCO Audit Notes, at 4.)

   In addition to these issues, it is Wills's opinion that "[c]ase management duties resembled claim adjuster duties that were charged as medical in the amount of $4,215." (Ex. 7 to WRAMSCO Audit Notes, at 4-5.)

### 3. Claimant No. 3

Claimant No. 3 injured his wrist and shoulder on April 16, 1993. He continued regular employment until June 22, 1993 when he stopped working due to the injury. (St. Paul 56.1 ¶ 36; Ex. 11 to WRAMSCO Audit Notes, at 1-2.) According to Wills, St. Paul's investigation did not include any inquiry into the job Claimant No. 3 was performing on April 16, 1993; whether he had complained of injuries between April 16 and June 22, 1993; whether he had exhibited any disability between those dates; what he claimed as an injury between those dates; or whether USFP had accommodated his job duties between those dates. (Ex. 11 to WRAMSCO Audit Notes, at 5.) In addition, USFP notes that an internal fax between St. Paul investigators concerning the merits of a different claim contrasted that other claim, which "sound[ed] legitimate," with this one, which the investigators called an "obvious B.S. claim[]." (Fax from J. White to N. Houlihan of 10/27/94, Ex. 29 to USFP 56.1; USFP 56.1 ¶ 57.) St. Paul calculated Claimant No. 1's average weekly wage as $998.80; Wills calculated the average weekly wage as $934.59. (USFP 56.1 ¶ 56.) St. Paul settled the case on or about January 4, 1995. (St. Paul 56.1 ¶ 36.)

### 4. Claimant No. 4

Claimant No. 4 fell off a ladder and injured his knee on June 28, 1994. (Ex. 8 to WRAMSCO Audit Notes, at 1.) He did not report the injury, however, until November 14, 1994. (*Id.*; USFP 56.1 ¶ 58.) According to Wills, St. Paul did not obtain any statements from Claimant No. 4, his supervisor, or any witnesses. (USFP 56.1 ¶ 59.) St. Paul insists that such statements are reflected in the claimant's First Report of Injury and the medical history as recorded by Claimant No. 4's doctors. (St. Paul 56.1 Resp. ¶ 59.) The case settled when Claimant No. 4 accepted a January 9, 1996 settlement offer from St. Paul. (St. Paul 56.1 ¶ 33; Ex. 8 to WRAMSCO Audit Notes, at SPC1040.)

**5. Claimant No. 5**

Claimant No. 5 slipped on a wet floor and injured his shoulder on December 4, 1990. (Ex. 5 to WRAMSCO Audit Notes, at 1; St. Paul 56.1 ¶ 28.) A June 5, 1991 memo from Rusty Pinckney, a senior claim representative with St. Paul, to Larry Neff, a St. Paul workers' compensation supervisor, stated that St. Paul would "vigorously pursue third-party recovery" from the manager of the building where Claimant No. 5 fell. (*Id.* at SPC5212.) In Wills's view, St. Paul did not pursue any such third-party recovery. (*Id.* at 4.) St. Paul insists that the claim handler considered the possibility of a third-party claim but that "the referenced documents show the injury resulted from a natural accumulation for which no recovery is permitted." (St. Paul 56.1 Resp. ¶ 60.) St. Paul does not specify which of the 75 pages attached to Exhibit 5 of the WRAMSCO Audit Notes support this assertion.

St. Paul calculated Claimant No. 5's average weekly wage as $880; by Wills's calculation, the average weekly wage was only $865.16. (USFP 56.1 ¶ 61.) St. Paul settled the claim on December 11, 1992. On December 16, 1992, St. Paul sent a fax to David Jennings of The Rockwood Company advising him of the settlement. (St. Paul 56.1 ¶¶ 28, 30; Ex. 5 to WRAMSCO Audit Notes, at SPC5369.) Huennekens testified that he formed the belief that Claimant No. 5 had been overpaid at the time of settlement because he knew that Claimant No. 5 was going to retire soon thereafter. (*Id.* ¶ 29; Huennekens Dep., Ex. E to St. Paul 56.1, at 335-37.) Huennekens stated that he "probably expressed [his] concern to the agent but other than that, what did you want me to do about it. It was done." (Huennekens Dep., at 337-38.)

**6. Claimant No. 6**

Claimant No. 6 sustained a hernia on February 5, 1991. (Ex. 2 to WRAMSCO Audit Notes, at 1.) He first reported the injury six days later on February 11, 1991, which was also his last day of work. He underwent hernia repair surgery on February 20, 1991 and received temporary total

disability benefits totaling $6,956.45. (*Id.*; St. Paul 56.1 ¶ 25; USFP 56.1 ¶ 62.) St. Paul did not obtain any statements from co-workers and, according to Wills, St. Paul also failed to investigate Claimant No. 6's activities between the date of injury and the date he reported the injury. (USFP 56.1 ¶¶ 62, 63.) St. Paul claims that "documents referenced in Mr. Wills' report themselves reflect investigation performed by St. Paul, including medical reports discussing the post-accident period." (St. Paul 56.1 Resp. ¶ 63.) The medical reports do indicate that Claimant No. 6 continued to work for several days after the injury, but they say nothing about the type of work he performed. (*See, e.g.*, Ex. 2 to WRAMSCO Audit Notes, at SPC10699, SPC10695.)

St. Paul calculated Claimant No. 6's average weekly wage as $880. Wills claims this figure is too high and should have been only $872.88. (USFP 56.1 ¶ 64.)

### 7. Claimant No. 7

Claimant No. 7 injured his shoulder on August 27, 1991. According to Wills, St. Paul improperly charged USFP for case management duties that resembled claim adjuster duties. St. Paul settled the claim in or about September 1992 for "35% of an arm," but Wills says that based on the "Q-Dex," a Quick Index to Industrial Commission Decisions in Illinois, the "probable Arbitration value would approximate 20% of an arm." (USFP 56.1 ¶ 65; Ex. 16 to WRAMSCO Audit Notes, at 1-3; St. Paul 56.1 ¶ 41.) In addition, St. Paul calculated an average weekly wage for Claimant No. 7 as $502, but Wills believes the figure should have been only $462.96. (*Id.* ¶ 66.)

### 8. Claimant No. 8

Claimant No. 8 sustained a hernia on November 1, 1993. (St. Paul 56.1 ¶ 27; Ex. 4 to WRAMSCO Audit Notes, at 1, SPC10940.) St. Paul's claim file indicates that Claimant No. 8 had injured himself about one month earlier. The adjuster notes confirm that Claimant No. 8's supervisor verified the November 1 incident, but the notes also state that there were no witnesses to the injury. (USFP 56.1 ¶ 67; Ex. 4 to WRAMSCO Audit Notes, at 2-3, SPC10943.) Wills claims

13

that the file did not contain a wage statement reflecting Claimant No. 8's wages at the time of his injury; St. Paul notes that the First Report of Injury identifies an average weekly wage of $1,000. (St. Paul 56.1 Resp. ¶ 67; Ex. 4 to WRAMSCO Audit Notes, at SPC10940.) By Wills's estimation, Claim No. 8 was worth $0 but St. Paul valued it at $11,256.11. (Ex. 9 to WRAMSCO Audit Report, Ex. F. to St. Paul 56.1.) Claimant No. 8 returned to work on February 21, 1994. (St. Paul 56.1 ¶ 27.)

### 9. Claimant No. 9

Claimant No. 9 injured his knee on October 24, 1994. (St. Paul 56.1 ¶ 38; Ex. 13 to WRAMSCO Audit Notes, at 1.) St. Paul did not interview two individuals Claimant No. 9 identified as witnesses to the accident, and though medical records indicated that Claimant No. 9 had suffered a prior injury to the same knee, St. Paul neither referred to nor inquired about the earlier injury. (USFP 56.1 ¶ 69; St. Paul 56.1 Resp. ¶ 69.) St. Paul calculated Claimant No. 9's average weekly wage to be $1,070.80; by Wills's calculation, the average weekly wage was only $1,003.90. (*Id.* ¶ 68.) St. Paul settled Claimant No. 9's claim on November 18, 1995. (St. Paul 56.1 ¶ 38.)

### 10. Claimant No. 10

Claimant No. 10 hurt his knee when he slipped on some mud on April 5, 1994. (St. Paul 56.1 ¶ 35; Ex. 10 to WRAMSCO Audit Notes, at 1.) According to Wills's summary of the file, after the injury, Claimant No. 10 went for an independent medical examination and reported that he could perform some activity around the house such as cutting the lawn.[17] (Ex. 10 to WRAMSCO Audit Notes, at 2.) The claim adjuster, however, did not ask Claimant No. 10's doctors how he was able to perform physical activities at home but not at his job. (*Id.* at 4; St. Paul 56.1 Resp. ¶ 70.)

---

[17] The parties did not produce the underlying report from the independent medical examiner.

Claimant No. 10 filed a lawsuit against Ford Motor Company, Edward Gray Corporation, and Accurate Ready Mix relating to his knee injury.[18] The case settled for $40,000 and the lawsuit was dismissed on or about December 17, 1996. According to Wills, St. Paul should have received over $43,600, representing 75% of its lien on that lawsuit. Instead, St. Paul agreed to accept only about $13,300. (USFP 56.1 ¶ 71; Ex. 10 to WRAMSCO Audit Notes, at 4; Ex. 10 to WRAMSCO Audit Notes, at SPC1526; St. Paul 56.1 ¶ 35; USFP 56.1 Resp. ¶ 35.) Wills does not explain how St. Paul could expect to recover a lien amount greater than the settlement figure. For its part, St. Paul responds only that "[t]he full lien amount is a matter of interpretation. For example, what is considered the 'full amount' of a lien when the employee is found 49% at fault?" (St. Paul 56.1 Resp. ¶ 71.)

USFP claims that St. Paul failed to investigate the worksite where Claimant No. 10 was injured even though the case involved third-party claims against Ford Motor Company, Edward Gray Corporation, and Accurate Ready Mix. (USFP 56.1 ¶ 71; File Notes, Ex. 30 to USFP 56.1; Ex. 10 to WRAMSCO Audit Notes, at SPC1525-26.) St. Paul disagrees and again insists that unspecified documents referenced in Wills's report reflect due investigation of the worksite. (St. Paul 56.1 Resp. ¶ 71.) It is not clear to the court which of the produced documents purportedly support St. Paul's position.

### 11. Claimant No. 11

Claimant No. 11 injured himself on November 11, 1992 when he fell off a walkway on his way to a job site. (Ex. 15 to WRAMSCO Audit Notes, at 1; St. Paul 56.1 ¶ 40.) St. Paul's "house counsel" handled the case but, Wills says, wrongfully charged USFP $8,393.55 for those legal services. (*Id.* at 2; USFP 56.1 ¶ 72.) St. Paul claims that it charged "fees" only "in the sense of court charges, copying charges, court reporters, etc." (St. Paul 56.1 Resp. ¶ 11.) St. Paul settled

---

[18]     Presumably, these companies were the general contractor and subcontractor for the construction site where Claimant No. 10 was injured.

the case for $1,500 on May 9, 1997; Wills says the case was worth $0. (Ex. 15 to WRAMSCO Audit Notes, at 2, SPC1228; St. Paul 56.1 ¶ 40; Ex. 9 to WRAMSCO Audit Report, Ex. F. to St. Paul 56.1.)

### 12. Claimant No. 12

Claimant No. 12 tore the cartilage in his knee on June 20, 1994. (Ex. 1 to WRAMSCO Audit Notes, at 1; St. Paul 56.1 ¶ 24.) He had dislocated the same knee on at least one prior occasion and, in Wills's opinion, St. Paul failed to ascertain whether he had suffered a work-related accident covered by the workers' compensation statute. Specifically, the adjuster did not ask the doctor how old Claimant No. 12's knee tear was or whether the tear had caused the prior dislocations. (*Id.* at 2.) USFP notes that Claimant No. 12 missed time from work to have knee surgery, but the claim file does not contain any medical report describing the procedure or its results. (USFP 56.1 ¶ 73.) Claimant No. 12 returned to work on August 8, 1994. He received a total of $14,466.84 on his claim. (St. Paul 56.1 ¶ 24; Ex. 1 to WRAMSCO Audit Notes, at 2.) St. Paul claims that the last charge occurred on December 2, 1995, though the cited documentation does not confirm this assertion. (*Id.*)

### 13. Claimant No. 13

Claimant No. 13 injured his shoulder on October 2, 1992. (Ex. 9 to WRAMSCO Audit Notes, at 1; St. Paul 56.1 ¶ 34.) Wills states that St. Paul failed to obtain all of the medical records relating to the injury, noting that the claim file does not include records from one of the doctors. Wills also states generally that "[p]ertinent medical was not obtained," but it is not clear whether he is referring to records besides those missing from the one physician. (*Id.* at 5-6.) St. Paul insists that relevant medical records "were obtained" but fails to direct the court to any specific records from the doctor in question, or to any documents which prove that further records were unnecessary. (St. Paul 56.1 ¶ 74.)

16

Also missing from the claim file, Wills says, is documentation regarding Claimant No. 13's wage rate at the time of injury. (USFP 56.1 ¶ 74; Ex. 9 to WRAMSCO Audit Notes, at 5-6.) St. Paul directs the court to the Employer's Report of Industrial Injury, which indicates an hourly wage of $19.35. (St. Paul 56.1 Resp. ¶ 74.) Wills finally opines that St. Paul failed to investigate Claimant No. 13's accident, to obtain any witness statements, or to determine whether Claimant No. 13 had been injured on another job. (USFP 56.1 ¶ 75.) Again without specific citation or reference, St. Paul claims that the "documents referenced in Mr. Wills' report themselves show investigation by St. Paul of the incident and the date it took place." (St. Paul 56.1 Resp. ¶ 75.) The court notes that in addition to medical records from two physicians and a physical therapist, there is one Investigator's Interview Memorandum and a surveillance report in the file. According to the surveillance report, an investigator observed Claimant No. 13 lifting and carrying and noted that Claimant No. 13 appeared to be employed at the Biltmore Fountain Office Building. (Ex. 9 to WRAMSCO Audit Notes, at SPC8612-13, SPC10454-57.)

### 14. Claimant No. 14

Claimant No. 14 sustained a back injury on July 17, 1992. (Ex. 14 to WRAMSCO Audit Notes, at 1; St. Paul 56.1 ¶ 39.) Wills states that St. Paul failed to investigate whether Claimant No. 14 was working another job despite surveillance evidence that he was possibly working for another employer. (*Id.* at 5; USFP 56.1 ¶ 76.) St. Paul claims it did investigate this issue as evidenced by "[t]he documents referenced in Mr. Wills' report." (St. Paul 56.1 Resp. ¶ 76.) St. Paul did not identify which of the more than 80 documents attached to Exhibit 14 refers to Claimant No. 14's alleged employment with another company, nor was the court able to find such a reference in its own review of the documents. Claimant No. 14's claim was settled on or about March 30, 1994. (St. Paul 56.1 ¶ 39.)

### 15.   Claimant No. 15

Claimant No. 15 suffered a hernia on July 29, 1994 but did not report the injury until September 23, 1994. (Ex. 3 to WRAMSCO Audit Notes, at 1; St. Paul 56.1 ¶ 26; USFP 56.1 ¶ 77.) According to Wills, the claim file did not contain any medical records from one of the treating physicians, or the operative report from Claimant No. 15's surgery. (*Id.* at 2.) St. Paul responds only that it requested "all medical records" from physicians. (St. Paul 56.1 Resp. ¶ 78.) The court is not certain which document purportedly establishes this fact.

St. Paul calculated Claimant No. 15's average weekly wages to be $1,070.80; Wills's calculations, in contrast, resulted in an average weekly wage of $1,018.05. (USFP 56.1 ¶ 79.) Claimant No. 15 returned to work on November 28, 1994. (St. Paul 56.1 ¶ 26.)

### 16.   Claimant No. 16

Claimant No. 16 injured his back on September 14, 1994. (Ex. 6 to WRAMSCO Audit Notes, at 1; St. Paul 56.1 ¶ 31.) St. Paul did not take a statement from Claimant No. 16, instead relying on the statements Claimant No. 16 made to his employer and doctors. (USFP 56.1 ¶ 80; St. Paul 56.1 Resp. ¶ 80.) Claimant No. 16 had injured his back in January 1994 but St. Paul did not question the doctor about the earlier injury or its relation, if any, to the later one. (Ex. 6 to WRAMSCO Audit Notes, at 3.) St. Paul's claim file did not contain a wage statement for Claimant No. 16, but St. Paul directs the court to the Employer's First Report of Injury, which indicates a gross annual salary of $44,855. (*Id.* at 3, SPC1210; USFP 56.1 ¶ 81; St. Paul 56.1 Resp. ¶ 81.) Claimant No. 16 returned to work on February 20, 1995. (St. Paul 56.1 ¶ 31.)

### D.   This Lawsuit

As noted, WRAMSCO audited six of the 16 disputed claim files in August 2001. The record is silent as to what transpired between the parties during the following year, but on September 6, 2002, USFP filed suit against St. Paul in the Circuit Court of Cook County, Illinois, alleging breach

of contract in connection with 15 workers' compensation claim files.[19]  Specifically, USFP claimed

that St. Paul mishandled investigations, evaluations, and settlements relating to those files and, as

a result, charged USFP excessive and unreasonable premiums.  St. Paul timely removed the case

to this court on the basis of federal diversity jurisdiction.  28 U.S.C. § 1332.  On October 24, 2002,

St. Paul filed its Answer and Counterclaim alleging breach of contract based on USFP's failure to

pay premiums allegedly still owed under the Loss Sensitive Policies.  (USFP 56.1 ¶ 26;

Counterclaim.)  St. Paul amended its counterclaim on May 14, 2003 to reflect that the Loss

Sensitive Policies were subject to a "Total Cost Agreement" in addition to the Retrospective Rating

and/or Deductible Endorsement.  The Amended Counterclaim does not define or explain that new

term.  (Amended Counterclaim ¶ 4.)  Shortly thereafter on June 1, 2003, St. Paul issued USFP a

$25,636 credit against the previously billed and unpaid premiums for the 1993 to 1994 policy year.

(USFP 56.1 ¶ 10; Letter from A. Miller to G. Huennekens of 6/1/03, Ex. 4 to USFP 56.1.)  The

parties do not explain the specific basis for this credit.

## F.    The Confusion Over Disputed Claims

Though the Complaint indicated that USFP was disputing 15 claim files, it initially identified

only nine such files – Claimant Nos. 3, 4, 8, 10, 11, 12, 13, 15, and 16 – in answering St. Paul's

interrogatories.  (*See* Answer and Amended Answer to Supplemental Interrogatories, Exs. B and

C to St. Paul's Motion to Strike Expert Report, ¶ 1.)  On December 3, 2003, USFP served St. Paul

with its expert report from Raymond Wills, identifying seven additional disputed files – Claimant

Nos. 1, 2, 5, 6, 7, 9, and 14.  St. Paul sought to strike the report for improperly and unfairly raising

new claims, but the court denied the motion and instead allowed the parties to conduct additional

discovery relating to those files.

---

[19]    The court presumes that the "15 workers' compensation and general liability claim
files" referenced in the complaint are the same ones reviewed and audited by WRAMSCO.

St. Paul now seeks summary judgment on USFP's claim that St. Paul breached contractual and fiduciary duties by mishandling the 16 files, and on its amended counterclaim for payment of additional premiums.

## DISCUSSION

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether there is a genuine issue of fact, the court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

St. Paul argues that USFP's claims are barred by the doctrines of account stated and laches, public policy, and the statute of limitations. St. Paul also claims that there is no evidence that it handled the workers' compensation claims in an unreasonable manner, or that its actions caused USFP any injury. USFP argues that St. Paul has waived its affirmative defenses; that those defenses fail in any event; and that genuine issues of fact preclude summary judgment as to the reasonableness of St. Paul's claim handling.

## I.     Affirmative Defenses

St. Paul asserts four affirmative defenses to USFP's lawsuit: account stated, laches, public policy, and statute of limitations. USFP argues that St. Paul waived all of these defenses by failing to raise them in its amended answer as required by FED. R. CIV. P. 8(c). *See Brunswick Leasing Corp. v. Wisconsin Central, Ltd.*, 136 F.3d 521, 530 (7th Cir. 1998) ("[a]s a general matter, an affirmative defense that is not timely pleaded is waived"). St. Paul filed an answer to the Complaint on October 24, 2002 and an amended answer on May 14, 2003. Neither of those pleadings raised any affirmative defenses. St. Paul claims that "until U.S. Fire's expert report was filed, St. Paul was

20

generally unaware as to what issues were being raised with respect to the claims St. Paul believed were at issue." (St. Paul Reply, at 2.)[20] According to St. Paul, it could not in good faith have raised any affirmative defenses until "it became clear U.S. Fire was not complaining about the most recent invoice *per se* but about long past invoices." (*Id.*)

The chronology here undermines St. Paul's position. USFP submitted its expert report identifying all disputed claim files on December 3, 2003. The court denied St. Paul's motion to strike that report on January 22, 2004, yet rather than seek leave to file affirmative defenses at that time, St. Paul instead chose to raise them for the first time in this motion for summary judgment, filed on April 23, 2004. Courts have found waiver under similar circumstances. *See Johnson v. Sullivan*, 922 F.2d 346, 355 (7th Cir. 1990) (affirmative defense not raised in initial answer was waived); *MCI Telecommunications Corp. v. Ameri-Tel, Inc.*, 852 F. Supp. 659, 666 (N.D. Ill. 1994) (refusing to consider affirmative defenses raised for the first time in responding to a summary judgment motion). The court is not persuaded that St. Paul did not realize USFP was complaining about "long past invoices" prior to filing for summary judgment; to the contrary, in its original Complaint, USFP challenged the handling of workers' compensation claims dating back to the early 1990s and the premiums they generated. Significantly, the nine claim files St. Paul knew to be at issue throughout this case relate to claims from as early as October 1992. Even assuming that the affirmative defenses only became apparent upon receipt of the expert report, moreover, "[t]he appropriate thing for the defendant to do, of course, [wa]s to promptly seek the court's leave to amend [its] answer." *Venters v. City of Delphi*, 123 F.3d 956, 967-68 (7th Cir. 1997). St. Paul has not explained its failure to do so here.

Nevertheless, waiver is not automatic; courts have allowed parties to raise affirmative defenses at the summary judgment stage where the opposing party has had an opportunity to

---

respond and there is no showing of prejudice from the delay. *Peters v. Northern Trust Co.*, No. 92 C 1647, 1999 WL 515481, at *17 (N.D. Ill. July 15, 1999) (permitting affirmative defense to be raised in motion for summary judgment where the opposing party had an opportunity to conduct discovery on the defenses and craft arguments in response); *Duncan v. Consolidated Freightways Corp.*, No. 94 C 2507, 1995 WL 530652, at *5 (N.D. Ill. Sept. 7, 1995) ("[t]his Court allows affirmative defenses to be introduced in a motion for summary judgment where the plaintiff would not suffer prejudice"). USFP has addressed the merits of the affirmative defenses in responding to St. Paul's motion and has not established any prejudice resulting from the delay. Thus, the court will consider the merits of those defenses.

### A.    Account Stated

St. Paul argues that USFP's claims are barred by the doctrine of account stated because it "acquiesced in St. Paul's billings for years and, even when U.S. Fire finally started raising questions, it slept on its rights." (St. Paul Mem., at 1) (citing *La Grange Metal Products v. Pettibone Mulliken Corp.*, 106 Ill. App. 3d 1046, 436 N.E.2d 645 (1st Dist. 1982)).[21] An "account stated" is "a form of proving damages for a breach of a promise to pay on a contract." *Truserv Corp. v. Flegles Inc.*, No. 03 C 3284, 2004 WL 1656567, at *5 (N.D. Ill. July 22, 2004) (quoting *Dreyer Med. Clinic, S.C. v. Corral*, 227 Ill. App. 3d 221, 226, 591 N.E.2d 111, 114 (2d Dist. 1992)). As one court recently explained, an account stated

> determines the amount of a preexisting debt when parties who previously have conducted monetary transactions agree that there truly is an account representing the transactions between them and one party renders a statement of account to another who retains that statement beyond a reasonable amount of time without objection.

*ITQ Lata, LLC v. MB Financial Bank, N.A.*, 317 F. Supp. 2d 844, 858 (N.D. Ill. 2004). By retaining the statement of account for an unreasonable time without objection, the receiving party

---

[21]    St. Paul's Memorandum of Law in Support of its Motion for Summary Judgment is cited as "St. Paul Mem., at __."

acknowledges that the balance is accurate and due. *Id.* (citing *Motive Parts Co. of America, Inc. v. Robinson*, 53 Ill. App. 3d 935, 941, 369 N.E.2d 119, 124 (1st Dist. 1977)) (an account stated "is merely a final determination of the amount of an existing debt"). Merely sending an invoice does not create an account stated unless the debtor or creditor intends to establish a balance due or a final settlement to date. *Toth v. Mansell*, 207 Ill. App. 3d 665, 672, 566 N.E.2d 730, 735 (1st Dist. 1990).

By their terms, the Loss Sensitive Policies allowed St. Paul to recalculate USFP's premiums annually based on losses incurred under the policies. USFP paid St. Paul's invoices reflecting those retrospective premiums until December 1997, at which time it began questioning the additional premiums and declined to pay further invoices. St. Paul argues that by making payments under the policies until December 1997, USFP acknowledged that it owed the amounts stated and is now barred from challenging the invoices. (St. Paul Mem., at 2.) USFP argues that none of the invoices constituted a "final" bill as required for an account stated. Indeed, St. Paul issued invoices in 1998, 2000, and 2001 charging USFP additional premiums under the policies. (USFP Resp., at 4.)[22] St. Paul did not finally close the three policies in effect between 10/27/90 and 10/27/93 until sometime after this lawsuit was filed. (USFP 56.1 ¶ 22; Tredinnick Dep., Ex. 15 to USFP 56.1, at 85-87; St. Paul 56.1 Resp. ¶ 24.) St. Paul has yet to close the policy in effect from 10/27/93 to 10/27/94; indeed, in June 2003, well after this lawsuit was filed, St. Paul refunded USFP $25,636 paid under that policy.

St. Paul has not established, as a matter of law, that its invoices constituted an account stated on any of the Loss Sensitive Policies. St. Paul concedes that the existence of an account stated is a question of fact, *La Grange Metal Products*, 106 Ill. App. 3d at 1053, 436 N.E.2d at 651, but claims that in light of Huennekens's admitted receipt and review of the annual invoices, he "was

---

[22]     USFP's Opposition to St. Paul's Motion for Summary Judgment is cited as "USFP Resp., at ___."

clearly acquiescing in St. Paul's statement of the account." (St. Paul Mem., at 2.) To the extent each invoice was subject to change the following year, none "render[ed] certain the amount of a debt for preexisting liability" as required for an account stated. *Toth*, 207 Ill. App. 3d at 672, 566 N.E.2d at 735. Moreover, St. Paul offers nothing to support its theory that USFP retained the invoices for an unreasonable time without objection. "What constitutes a reasonable amount of time within which to make an objection depends upon the circumstances of the case, the ordinary course of business, and the relationship of the parties." *ITQ Lata*, 317 F. Supp. 2d at 858. Absent any argument on these issues, St. Paul has not demonstrated that it is entitled to summary judgment on a theory of account stated.

## B. Laches

St. Paul next argues that USFP's claims are barred by the doctrine of laches. Laches is "the neglect or omission to assert a right which, taken in conjunction with a lapse of time and circumstances causing prejudice to the opposite party, will operate as a bar to a suit." *Bill v. Board of Educ. of Cicero Sch. Dist. 99*, 351 Ill. App. 3d 47, 54, 812 N.E.2d 604, 610 (1st Dist. 2004) (quoting *Lee v. City of Decatur*, 256 Ill. App. 3d 192, 195, 627 N.E.2d 1256, 1258 (4th Dist. 1994)). For laches to apply, a plaintiff must have knowledge of his right but fail to assert it in a timely manner. *Id.* St. Paul claims that USFP "was surely aware of all potential issues [in] this case years ago, during the claim meetings." (St. Paul Mem., at 2.) Without citing any supporting authority, St. Paul insists that an insured always knows a potential claim exists under a retrospective policy, and that the laches doctrine is designed to prevent the inequity that results when "a party recognizing it *may* have a claim . . . simply refuses to look to see if it has a claim." (St. Paul Reply, at 4-5) (emphasis in original).

USFP insists that it was not aware of its claims against St. Paul until Mr. Wills completed his initial audit on July 24, 1998. (USFP Resp., at 7.) In the court's view, the mere fact that there

24

may always be potential claims under a retrospective policy does not establish that USFP knew prior to July 1998 about the particular claims asserted here, but knowingly "slept" on them. *City of Chicago v. Alessia*, 348 Ill. App. 3d 218, 228-29, 807 N.E.2d 1150, 1159 (1st Dist. 2004) (plaintiff who knowingly "slept" on its rights is deemed to have acquiesced to the defendant's actions). Nor is it clear that USFP knew about potential claims against St. Paul at the time each workers' compensation claim was settled or closed. (St. Paul Motion ¶¶ 11-18.)[23] St. Paul annually recalculated premiums after the claims settled, and it was those new premium calculations that ultimately prompted USFP to obtain an audit and question the underlying claim handling.

There is sparse evidence in the record as to what transpired between the parties between July 1998 and the date USFP filed this lawsuit in September 2002. USFP claims that it was attempting to negotiate a settlement with St. Paul, and it does appear that the parties exchanged correspondence and attended meetings to discuss the disputed claims and the possibility of arbitration. (USFP Resp., at 7; Letter from R. Wills to S. Kim of 6/17/99, Ex. 8 to USFP 56.1; Letter from R. Wills to G. Huennekens of 7/20/00, Ex. 13 to USFP 56.1.) In any event, St. Paul has not demonstrated that it was unfairly prejudiced by the delay in filing suit. *See LaSalle Nat'l Bank v. Dubin Residential Communities Corp.*, 337 Ill. App. 3d 345, 351, 785 N.E.2d 997, 1002 (1st Dist. 2003) ("[i]f the defendant is not injured by the delay, laches is inapplicable") (internal quotations omitted). St. Paul asserts generally that it is unfair for a party to delay its investigation of potential claims until "witnesses are gone, until memories have faded, and otherwise the evidence of all defenses is lost." (St. Paul Reply, at 5; St. Paul Mem., at 2) (citing *Tully v. State*, 143 Ill.2d 425, 434, 574 N.E.2d 659, 662-63 (1991)) (Illinois Appellate Court judge who waited a year before challenging statute requiring his automatic retirement was barred from contesting election of

---

[23]     St. Paul's Motion for Summary Judgment is cited as "St. Paul Motion ¶ __."

another judge to his seat; "while candidates expended considerable time, energy and money on their campaigns, he sat by and did not raise any objection to their candidacy").

As evidence of such prejudice, St. Paul points only to the deposition of USFP President Gregg Huennekens, in which Huennekens often responds to questions with "I don't remember" or "I don't recall." (*Id.*) St. Paul has not explained how Huennekens' failing memory on any specific question has prejudiced St. Paul's ability to defend this lawsuit, and it is not this court's responsibility to wade through the 540-page deposition and speculate as to St. Paul's theory. In addition, as USFP notes, St. Paul was able to file a counterclaim against USFP for amounts due under the same Loss Sensitive Policies. (USFP Resp., at 7) ("equity will not allow St. Paul to bring its own contract claims while barring USFP from asserting its claims"). Absent compelling evidence of prejudice in this case, there is no basis for St. Paul's laches defense.

### C.    Public Policy

St. Paul claims that summary judgment is nonetheless appropriate here because Illinois public policy favors settlement, and "[n]o insurer will settle any claim under a retrospective premium or other loss sensitive policy if the insured can reap the benefit of a settlement but then question the settlement after the fact." (St. Paul Motion ¶ 34.) *See, e.g., Pritchett v. Asbestos Claims Mgmt. Corp.*, 332 Ill. App. 3d 890, 900, 773 N.E.2d 1277, 1285 (5th Dist. 2002) ("[p]ublic policy in Illinois favors settlements and dictates that, absent fraud or duress, settlements should be final"). In St. Paul's view, public policy requires that "the review of an insurer's decision to settle . . . be deferential, and insureds that wish to challenge those decisions should be required to meet a high burden." (St. Paul Reply, at 3.) USFP responds that St. Paul has settled the underlying workers' compensation claims, but has not settled the amount USFP owes in retrospective premiums. In other words, "Illinois public policy does not affect USFP's claim against St. Paul because USFP simply wants its premiums back from St. Paul." (USFP Resp., at 5.)

The Complaint makes clear that USFP is challenging the premiums generated by St. Paul's alleged mishandling of certain workers' compensation claims. There is no evidence that USFP is seeking to overturn those underlying settlements in this lawsuit and, thus, St. Paul's public policy concerns are without foundation.

### D. Statute of Limitations

St. Paul's final affirmative defense relates solely to the workers' compensation claim filed by Claimant No. 1. St. Paul notes that it settled Claimant No. 1's claim on August 5, 1992, and argues that any attack on that settlement is barred by the applicable ten-year statute of limitations. (St. Paul Motion ¶ 35; St. Paul Mem., at 2.) *See* 735 ILCS 5/13-206 (setting forth ten-year limitation on contract claims). USFP argues that the statute of limitations does not begin to run until a plaintiff knew or reasonably should have known about a potential claim. (USFP Resp., at 5) (citing *Perelman v. Fisher*, 298 Ill. App. 3d 1007, 1013, 700 N.E.2d 189, 193 (1st Dist. 1998)) (trial court erred in dismissing breach of contract complaint as untimely where there were genuine issues of material fact as to when the plaintiff knew or should have known about the claim). As noted, USFP claims that it first learned about St. Paul's alleged mishandling of Claimant No. 1's file upon receiving Mr. Wills's audit in July 1998. (*Id.* at 6.) St. Paul nonetheless insists that USFP should have known of any issues relating to Claimant No. 1 immediately after settlement. St. Paul notes that Huennekens acknowledged at his deposition that he "most likely" learned about the resolution of the claim shortly after it settled, and that he "probably wasn't happy." (Huennekens Dep., at 471, 472.) Yet Huennekens does not recall complaining to St. Paul or taking any other action at that time. (*Id.* at 472.)

In the court's view, the fact that Huennekens knew about, and was unhappy with, the settlement does not in and of itself establish that he should have known the file was mishandled. At the same time, a jury could reasonably find that Huennekens should have expressed his

concerns and made further inquiries into the handling of the file upon learning of the settlement. USFP has raised a genuine issue of fact as to when it should have known about the mishandling of Claimant No. 1's file, and summary judgment is not appropriate on statute of limitations grounds. *See, e.g., Johnstone v. Wabick*, 207 F. Supp. 2d 824, 827 (N.D. Ill. 2002) ("[t]he determination of when the statute of limitations begins to run is ordinarily a question of fact for the jury") (internal quotation omitted); *Witherell v. Weimer*, 85 Ill.2d 146, 156, 421 N.E.2d 869, 874 (1981)).

## II.    Breach of Duty

Having determined that St. Paul is not entitled to summary judgment based on its affirmative defenses, the court next considers the merits of USFP's case. Before turning to that issue, however, the court briefly addresses St. Paul's assertion, raised for the first time in its reply brief, that it "does not concede the applicability of Illinois law to all matters in dispute." (St. Paul Reply, at 5.) St. Paul notes that the "Total Cost Agreement - Incurred Loss Basis" for the 1993-1994 policy year expressly provides that Minnesota law governs that agreement. (*Id.*) St. Paul did not provide the court with a copy of this document but claims, in any event, that "there is no substantial difference between Illinois and Minnesota law on the key points raised in its Motion for Summary Judgment." (St. Paul's Sur-Reply re "Additional Facts," at 7.) Notwithstanding its objection, in challenging USFP's breach of contract claim, St. Paul cites only one authority, an Illinois decision: *National Surety Corp. v. Fast Motor Service, Inc.*, 213 Ill. App. 3d 500, 572 N.E.2d 1083 (1st Dist. 1991). *See Siler v. Northern Trust Co.*, 80 F. Supp. 2d 906, 908 n.3 (N.D. Ill. 2000) ("[t]he parties appear to agree that Minnesota law governs this diversity case by relying almost exclusively on cases decided by Minnesota state courts"). The court will therefore analyze this claim under Illinois law.

28

## A.    Burden of Proof

In Illinois, "a cause of action is stated when an insured sues his insurer for a breach of duty for settling claims in an unreasonable manner when the policy of insurance contains a retrospective premium feature." *National Surety*, 213 Ill. App. 3d at 506, 572 N.E.2d at 1087. The insured in *National Surety*, Fast Motor, purchased workers' compensation policies with a retrospective premium feature which, like the one at issue in this case, allowed the insurer to adjust premiums annually based on the insured's prior years' losses. *Id.* at 502, 572 N.E.2d at 1085. A dispute arose between the parties and National Surety sued to recover premiums allegedly owed under the policies. Fast Motor filed a counterclaim alleging negligence in the handling of workers' compensation claims but the trial court granted a motion to strike the counterclaim for vagueness. *Id.* at 502-03, 572 N.E.2d at 1085. Thereafter, Fast Motor filed a separate complaint against National Surety, this time alleging breach of duty by failing to properly investigate and evaluate claims, and by overreserving and overpaying claims. *Id.* at 503, 572 N.E.2d at 1086. A jury found in favor of Fast Motor and National Surety appealed.

The Illinois Appellate Court noted the long-standing principle that an insurer owes its insured a duty of good faith and fair dealing, and that a cause of action exists when an insurer breaches that duty by wrongfully failing to settle an insurance claim within the policy limits. *Id.* at 505, 572 N.E.2d at 1087. The court held that "[l]ikewise, an insured should be able to state a viable cause of action for breach of an insurer's duty of good faith based on the insurer's failure to act reasonably when adjusting claims under a policy of insurance which contains a retrospective premium feature . . ." *Id.* The court reasoned that under retrospective premium policies, an insured is automatically subject to greater financial obligations in the form of increased premium rates when an insurer fails to act reasonably. *Id.* In reaching this conclusion, the court relied on *Deerfield Plastics Co. v. Hartford Ins. Co.*, 404 Mass. 484, 536 N.E.2d 322 (1989), noting with

approval the Massachusetts court's holding that once an insured produces evidence that a claim was handled negligently, the burden shifts to the insurer "to prove that the settlement made on the claim did not exceed the highest reasonable amount at which the claim would have probably been settled if it had been investigated properly." *National Surety*, 213 Ill. App. 3d at 506, 572 N.E.2d at 1087. *See also Liberty Mutual Ins. Co. v. Tribco Constr. Co.*, 185 F.R.D. 533, 540 (N.D. Ill. 1999) ("relying on *Fast Motor* and *Deerfield*, this court believes that Liberty [the workers' compensation insurer] should have the right to prove that the individual settlements were reasonable").

Neither the *National Surety* court nor the *Deerfield Plastics* court sets forth the type of evidence sufficient to show that a claim was negligently handled and to shift the burden of proof to the insurer. The *Deerfield Plastics* court did, however, instruct that "[w]hat might have resulted if the claim had been litigated before the Industrial Accident Board[24] is not significant." 404 Mass. at 485-86, 536 N.E.2d at 323-24. St. Paul finds it "inconceivable" that USFP can satisfy its initial burden "merely by saying that other things could have been done and, if they had been done, maybe there would have been a better result." (St. Paul Reply, at 5.) USFP has done more than generally assert that St. Paul should have handled the claims differently, however; USFP has produced a detailed expert report explaining the ways in which St. Paul allegedly mishandled each of the 16 claims. St. Paul challenges the qualifications of USFP's expert, a challenge the court addresses below.

### B.   Expert Qualifications

St. Paul argues that USFP's expert report does not support its claim of negligent handling because Mr. Wills is not qualified to provide an expert opinion. St. Paul first notes that Wills is neither an attorney nor a doctor, but he has offered testimony concerning legal and medical issues.

---

[24]     The Massachusetts Industrial Accident Board is the equivalent of the Illinois Industrial Commission.

(St. Paul Motion ¶¶ 111, 112; St. Paul 56.1 ¶¶ 62, 64.) This argument is a non-starter. Wills need only be qualified as an expert based on "knowledge, skill, experience, training, or education." FED. R. CIV. P. 702. Wills has worked in the insurance industry for over 25 years and, as Assistant Vice President of WRAMSCO, is involved in risk management, risk retention, risk transfer, and risk finance programs, including claim investigation and management, insurance program and claim audits, underwriting and premium development, and experience modification factor investigation and development. (USFP 56.1 ¶¶ 95, 96.) The workers' compensation files do contain medical and legal reports, but that does not render Wills unqualified to assess whether St. Paul's adjusters handled and evaluated the claims properly. As USFP points out, none of those claims adjusters are doctors or lawyers either. (USFP 56.1 ¶¶ 39, 40, 42, 43, 45.)

St. Paul next argues that Wills is not a credible witness, noting that one arbitrator discredited his testimony in another case and that Wills "probably disagree[s with arbitrators] most of the time." (St. Paul 56.1 ¶¶ 44, 45; Wills Dep., Ex. G to St. Paul 56.1, at 92-94, 195-96.) St. Paul finds it significant that Wills did not consult with Huennekens regarding the facts and circumstances of the claims; that Wills is not familiar with the demographics of USFP or how its business has changed since 1990; that Wills does not have knowledge pertaining to the sprinkler business; and that no one provided Wills with a legal, medical, or accounting opinion. (St. Paul 56.1 ¶¶ 54-58, 66-68.) St. Paul also notes that five petitions have been filed seeking to revoke WRAMSCO's license to handle claims based on allegations of improper claim handling. (Id. ¶ 49.) USFP responds that St. Paul's own attorneys and legal expert in this case have retained Wills as an expert witness in at least five other cases. (USFP 56.1 ¶¶ 86-92.) In USFP's view, "[if] Mr. Wills is a qualified expert when St. Paul's attorneys and St. Paul's legal expert need him, then he is no less a qualified expert when someone else retains him." (USFP Resp., at 12.)

All of these arguments merely raise questions of fact as to Wills's credibility, which are best resolved by the trier of fact. See Morus v. Kapusta, 339 Ill. App. 3d 483, 492, 791 N.E.2d 147, 155

(1st Dist. 2003) ("testimony offered by expert witnesses is to be judged by the same rules of weight and credibility applied to other witnesses, which are questions of fact for a jury").

## C. Reasonableness

Recognizing that the credibility issue will not support summary judgment in this case, St. Paul insists that its primary argument is that Wills "does not say much" in his expert report. (St. Paul Reply, at 6.) St. Paul argues that Wills has not demonstrated that St. Paul acted unreasonably in handling any of the disputed workers' compensation claims. In St. Paul's view, Wills merely speculates as to what might have happened had St. Paul conducted its investigations differently, which is insufficient to establish an initial showing of negligence. (St. Paul Motion ¶ 41.) The court disagrees. Wills identifies several files where St. Paul purportedly failed to obtain necessary medical reports or statements from the claimants and appropriate witnesses. Wills also claims that with respect to certain files, St. Paul failed to pursue third-party recovery or to investigate an injury worksite where appropriate; improperly calculated claimants' average weekly wages; failed to make proper inquiry into prior injuries and their effect on current injury claims; or failed to properly investigate claimant activities between the date of injury and the date of report. In the court's view, this is sufficient to raise a question of fact as to the reasonableness of St. Paul's claim handling.

St. Paul denies the accuracy of Wills's assertions but has not offered any affirmative evidence proving that it acted reasonably as a matter of law. The mere fact that Wills does not establish that the Industrial Commission would have denied compensation to the individual Claimants does not demonstrate that St. Paul's investigations were thorough or that the settlements it negotiated were reasonable. *See Deerfield Plastics*, 404 Mass. at 485-86, 536 N.E.2d at 323-24 (what might have resulted before the Industrial Commission is "not relevant"). (*See also* St. Paul Motion ¶¶ 67, 69, 71, 73, 77, 83, 88, 92, 108.) St. Paul objects that Wills cannot

raise a question of negligence by noting the existence of numerous unanswered questions. (*See* St. Paul Motion ¶¶ 80, 82, 83, 88, 94, 96, 108.) Again, the court disagrees. Once USFP presented evidence that St. Paul did not gather the information reasonably necessary to resolve a claim, the burden shifted to St. Paul to establish that it did. St. Paul insists that "[i]n not one of the sixteen claims does Mr. Wills explain why any particular act or omission caused U.S. Fire to suffer damages." (St. Paul Motion ¶ 65.) Wills's Audit Report, however, addresses how St. Paul's overvalued settlements led to increased premiums for USFP. At most, St. Paul has raised questions of fact as to the reasonableness of its claims handling and the damages it caused. Summary judgment must therefore be denied.

## III. Counterclaim

Having found genuine issues of fact precluding summary judgment on USFP's Complaint, the court also declines to grant summary judgment on St. Paul's Counterclaim to recover outstanding premium payments.

## CONCLUSION

For the reasons stated above, St. Paul's motion for summary judgment (Docket No. 44-1) is denied.

ENTER:

Dated: November 19, 2004

REBECCA R. PALLMEYER
United States District Judge